IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JULIA M. L.[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 17-cv-01295-CJP[2] |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Julia M. L. ("Plaintiff") seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for DIB and SSI on September 24, 2013, alleging a disability onset date of April 16, 2013. (Tr. 152-67). Her applications were denied at the initial level (Tr. 86-89) and again upon reconsideration (Tr. 97-99). Plaintiff requested an evidentiary hearing (Tr. 100-01), which Administrative Law Judge ("ALJ") Scot Gulick conducted on October 6, 2016. (Tr. 32-54). ALJ Gulick issued an unfavorable decision on November 29, 2016. (Tr. 18-26). The Appeals Council

---

[1] The Court will not use plaintiff's full name in this Memorandum and Order in order to protect her privacy. See FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.
[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. § 636(c). See Doc. 21.

denied Plaintiff's request for review, (Tr. 1-3), rendering the ALJ's decision the final agency decision. Plaintiff exhausted all her administrative remedies and filed a timely Complaint in this Court. (Doc. 1).

### Issues Raised by Plaintiff

Plaintiff argues the ALJ failed to properly consider the effects of her obesity, edema, and lymphedema on her RFC, applied an inaccurate legal standard when assessing her subjective complaints, and improperly weighed her activities of daily living.

### Applicable Legal Standards

To qualify for SSI or DIB, a claimant must be disabled within the meaning of the applicable statutes.[3] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. . . . If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The ALJ's Decision

ALJ Gulick found Plaintiff met the insured status requirements through June 30, 2018 and had not engaged in substantial gainful activity since April 16, 2013, the alleged onset date. (Tr. 20). Plaintiff had severe impairments of degenerative disc disease, osteoarthritis of the knees, hypertension, and obesity. (Tr. 20). None of her impairments or combination of impairments met or equaled a Listing. The ALJ determined Plaintiff had the RFC to lift and/or carry ten pounds occasionally; sit for six hours in an eight-hour workday; and stand and/or walk for two hours in an eight-hour workday. She could occasionally climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; and occasionally kneel, crouch, and crawl. (Tr. 21). Plaintiff was unable to perform any past relevant work but other jobs existed in significant numbers in the national economy that she could perform. The ALJ determined Plaintiff was not disabled. (Tr. 24-26).

## The Evidentiary Record

The following summary is directed at Plaintiff's arguments.

### 1. *Agency Forms*

In her agency forms, Plaintiff alleged that high blood pressure, human immunodeficiency virus ("HIV"), high cholesterol, and severe neck and back pain limited her ability to work. She weighed 315 pounds and was five-feet, nine-inches tall. Plaintiff previously worked as a cashier, as a certified nurse assistant, and in a restaurant. (Tr. 182-83).

Plaintiff said her back hurt so much she sometimes could not move. Her right knee locked and gave out when standing or walking. (Tr. 198). On an average day, Plaintiff got eight children ready for school, rested, took medication to alleviate her pain, and "slowly" performed household chores like cleaning, washing dishes, cooking, and laundry. Her significant other helped "a lot." Plaintiff could sleep for about two to three hours before she woke up from pain. (Tr. 199).

### 2. *Evidentiary Hearing*

Plaintiff appeared at an evidentiary hearing on October 6, 2016, at which she was represented by counsel. She lived at home with her children and husband, who assisted her with household chores. Plaintiff had experienced lower back pain for "years." In the previous six months, the pain travelled up to her middle spine as well. Plaintiff also experienced bilateral knee pain, which was worse in the right. The pain prevented her from squatting or kneeling. Plaintiff rated the pain at an eight out of 10, at its worst. She did not take any pain medication but used an ice

pack and a heating pad. When she used these methods, her pain was at about a five or six out of 10. Walking and sitting for too long exacerbated Plaintiff's back pain. Plaintiff took Tramadol at night to help her sleep but she did not take any other pain medication because her primary care physician was "not allowed to prescribe pain pills." Despite the Tramadol, Plaintiff had difficulty sleeping, so she napped for about an hour two to three times each day. For at least half of the day, Plaintiff laid down to accommodate physical discomfort. About 15 days in a 30-day period, Plaintiff's pain was so bad that she was incapacitated and in bed for most or all of the day. (Tr. 34-41). Plaintiff also had edema in her left leg since 2007, which required her to elevate her leg throughout the day. (Tr. 43).

Plaintiff drove her children "around the corner to school" once or twice each week. She did not drive more frequently because she was afraid her knees would lock up while driving. (Tr. 44).

Plaintiff could perform some household chores, like doing laundry and light cooking. She could perform a household task for approximately 10 to 15 minutes before needing to rest for about 45 minutes. (Tr. 42-43).

A vocational expert ("VE") also testified at the hearing. The ALJ asked the VE to consider a hypothetical individual of Plaintiff's age and education who could occasionally lift and carry 10 pounds, sit for six hours in an eight-hour workday, stand for two hours in an eight-hour workday, walk for two hours in an eight-hour workday, and occasionally climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; occasionally kneel; and occasionally crouch and crawl. The VE

opined that this individual could not perform Plaintiff's past work, but could perform others jobs, such as a booth cashier (Dictionary of Occupational Titles ("DOT") #211.462-010), information clerk (DOT #237.367-046), and table worker (DOT # 739.687-182). (Tr. 50-52).

The ALJ then asked the VE to consider a hypothetical individual with the same limitations who would also be off-task 15% of an eight-hour workday. The VE opined that an individual with those limitations would not be competitively employable. (Tr. 52-53).

The ALJ next asked the VE to consider if the first hypothetical individual who would also be absent from work two days each month. The VE opined that that individual would not be competitively employable. (Tr. 53).

### *3. Medical Records*

Plaintiff visited the HIV clinic on October 24, 2013. Her listed problems included lymphedema of the leg and obesity. A physical examination was normal. (Tr. 266-68).

Plaintiff saw Dr. Michael Berry at ORA Orthopedics on March 11, 2013 and complained of right knee pain. Four days prior, she fell on ice and had diffuse pain about her right knee ever since. She denied locking, catching, other mechanical symptoms, and instability. She reported pain with ambulation. Examination of her right knee revealed no ecchymoses, swelling, or deformity. She had full extension and flexion to 110 degrees with mild discomfort. Anterior and posterior drawer were negative. There was no laxity to varus or valgus stress. There was no

crepitus with range of motion. Ankle dorsiflexion and plantarflexion were full and her gait was only mildly antalgic. X-rays showed no fracture or dislocation. There was medial joint space narrowing, consistent with early arthritis. PA Thomas assessed Plaintiff with a right knee contusion with exacerbation of early osteoarthritis. PA Thomas did not recommend any advanced imaging at that point. She administered Plaintiff a cortisone injection and recommended physical therapy. PA Thomas kept Plaintiff off work for the remainder of the week. (Tr. 370-71).

Plaintiff followed up with the HIV clinic on April 2, 2014. On musculoskeletal exam, she had no muscle pain, weakness, decreased range of motion, gait disturbance, joint stiffness, or joint swelling. (Tr. 295).

Plaintiff followed up with Genesis Health Group on April 16, 2013. She complained of chronic left lower leg lymphedema, but said it had "not been causing her any problems whatsoever." On exam, lymphedema was appreciated in the left lower extremity and the right lower extremity was with trace edema. On musculoskeletal exam, Plaintiff had a normal range of motion and muscle strength and stability in all extremities with no pain on inspection. Nurse Practitioner Hull noted the lower leg lymphedema was stable without adverse symptoms and advised Plaintiff to monitor the condition and use compression. (Tr. 273-75).

Plaintiff followed up with Physician Assistant ("PA") Andrea Thomas at ORA Orthopedics on June 5, 2013 for right knee pain. The pain began in March 2013 after she fell and hit her knee on ice. Plaintiff described the pain as sharp, stabbing,

throbbing, and aching, and reported experiencing locking, catching, numbness, tingling, swelling, weakness, and stiffening that worsened with walking, standing, climbing stairs, exercising, lying flat, bending, kneeling, lifting, and with direct pressure. Rest, not moving, applying heat, sitting, and pain medications relieved her pain, which she rated at a 6/10 in severity. Injections had helped in the past. On exam, Plaintiff had full active, tender range of motion, zero degrees of extension, 130 degrees of flexion, and 5/5 strength of the right knee. There was an audible crepitus with motion in the right knee. PA Thomas reviewed an x-ray of Plaintiff's right knee, which was unremarkable. She assessed Plaintiff with right knee pain and back pain. PA Thomas recommended an MRI of the right knee and for Plaintiff to use ice and heat, and practice activity modification. (Tr. 368-69).

Plaintiff presented to the Genesis Health Group on June 11, 2013 with nausea, vomiting, diarrhea, transaminitis, mild splenomegaly, right knee pain, and chronic back pain with hypertriglyceridemia. On exam, Nurse Hull noted Plaintiff had lymphedema of the left lower extremity. Plaintiff demonstrated normal range of motion on musculoskeletal review. Nurse Hull assessed Plaintiff with gastrointestinal symptoms, right knee pain, chronic back pain, and hepatic steatosis. She instructed Plaintiff to follow up with Dr. Collins for knee pain. She wanted to delay addressing Plaintiff's back pain until Dr. Collins addressed Plaintiff's knee issue. Nurse Hull advised Plaintiff to lose weight to help with the hepatic steatosis. Nurse Hull also advised Plaintiff to remain off work until the MRI

of her right knee was completed and Dr. Collins made his recommendations. (Tr. 269-71).

Plaintiff presented to PA Thomas on June 20, 2013 and reported she was still experiencing cracking, popping, and locking of her right knee. Walking, standing, and kneeling exacerbated her symptoms while resting relieved them. She reported she received injections in the past, which were not very beneficial. She had no other musculoskeletal or neurological complaints. On exam, Plaintiff had full active, nontender range of motion and full strength of the bilateral knees. She had audible crepitus with motion of the right knee. PA Thomas reviewed an MRI and opined it demonstrated degenerative attenuation of the body of the medial meniscus. She assessed Plaintiff with right knee pain and recommended diagnostic right knee arthroscopy with debridement as necessary. Plaintiff wished to proceed with the procedure. PA Thomas noted Plaintiff was "going to be off work for the time being." Surgery was scheduled for July 10, 2013. (Tr. 366-67).

On July 10, 2013, Plaintiff underwent a right knee arthroscopy, partial medial meniscectomy, partial medial femoral condyle chondroplasty, and a lateral partial meniscectomy. (Tr. 380).

Plaintiff followed up with PA Thomas on July 22, 2013 and reported she was still having pain in her knee and felt like her knee locked more since surgery. She had no other musculoskeletal or neurological complaints. On exam, Plaintiff had full active, nontender range of motion and full strength of the bilateral knees. PA Thomas assessed Plaintiff with status post right knee arthroscopy with partial

medial and lateral meniscectomies, and partial medial femoral condyle chondroplasty. She prescribed Plaintiff ibuprofen and Ultram and instructed her to return to work with light duty restrictions. (Tr. 362-63).

Plaintiff followed up with PA Thomas on July 30, 2013 and said she was still having pain that worsened over the previous week. Her knee also continued to lock and click. She had no other musculoskeletal or neurological complaints. On exam, Plaintiff had full active, nontender range of motion and full strength of the bilateral knees. She had some mild discomfort to palpation over the medial aspect of the knee. PA Thomas assessed Plaintiff with status post right knee arthroscopy with partial medial and lateral meniscectomies, and medial femoral condyle chondroplasty. She recommended Plaintiff take the next three weeks off work and use heat and ice on her knee. She was going to continue her anti-inflammatory and nonnarcotic pain medication. PA Thomas noted they should consider steroid injections if she was still having symptoms after three weeks. (Tr. 360-61).

Plaintiff followed up with PA Thomas on August 19, 2013 and said she was still experiencing right knee pain along with popping and clicking. Her knee still locked up at least once a day, which lasted for, at most, one minute. She had no other musculoskeletal or neurological complaints. On exam, Plaintiff had full active, nontender range of motion and full strength in her extremities. PA Thomas assessed Plaintiff with right knee pain, status post right knee arthroscopy and administered right knee steroid injections. PA Thomas also recommended formal physical therapy for her right knee and instructed her to continue taking her

ibuprofen and Ultram. She told Plaintiff to remain off work for the next two weeks. (Tr. 358).

Plaintiff saw PA Thomas on September 10, 2013 and reported her right knee pain was "a little better but still giving out on her." She had no other musculoskeletal or neurological complaints. PA Thomas assessed Plaintiff with right knee pain and recommended she return to physical therapy. (Tr. 356).

Plaintiff presented to PA Thomas on September 24, 2013. She reported back, hip, and leg pain and stated her symptoms began in 1994 but became slightly worse over the previous few years. She described the pain as sharp, dull, stabbing, throbbing, aching, and burning. Plaintiff also reported numbness, tingling, weakness, instability, and swelling that worsened with walking, standing, climbing stairs, sitting lying flat, twisting, bending, kneeling, lifting, with direct pressure, and when coughing. Rest, heat, lying down, and medications relieved her pain. Her pain occasionally woke her from sleep. On exam, Plaintiff had full active and nontender range of motion with full 5/5 dorsiflexion, 5/5 EHL, and 5/5 plantarflexion. A straight leg raise test was negative and there were no tension signs. Her bilateral hips had internal and external rotation. She was nontender to palpation over the SI joints or greater trochanters bilaterally. Six views of the lumbar spine and pelvis showed minimal degenerative changes. PA Thomas assessed Plaintiff with back pain with mild and intermittent hip and leg pain. She recommended formal physical therapy for her lumbar spine and prescribed Plaintiff naproxen and Ultram. (Tr. 354-55).

Plaintiff visited the emergency room on July 21, 2014 with complaints of a backache. She reported 20 years of chronic L4-L5 back pain, which worsened over the previous 24 hours. The pain occasionally radiated into her legs. She denied numbness or tingling in the extremities. On exam, Plaintiff was positive for myalgias in the legs, radiating from the back, and back pain. She was negative for arhtralgias. She demonstrated tenderness of the lumbar back. She had a normal range of motion of the musculoskeletal system. She was diagnosed with hypertension, which was under control with medication, back pain with numbness and tingling in her legs and feet, arthritis of the hips, and swelling in the left leg. Plaintiff was prescribed hydrocodone, ibuprofen, and Medrol and discharged in stable condition. (Tr. 282-87).

Plaintiff returned to the HIV clinic for a follow up on August 13, 2014. On exam, she had no muscle pain, weakness, decreased range of motion, gait disturbance, joint stiffness, or joint swelling. She demonstrated mild pain in the middle of the back, in the lower region. Plaintiff was diagnosed with chronic low back pain. (Tr. 289-92).

On January 28, 2015, state-agency consultant Dr. William Lopez conducted a consultative exam of Plaintiff. Plaintiff complained of back, knee, and hip pain. Prolonged standing and sitting, lying down, climbing, kneeling, lifting, and bending aggravated Plaintiff's pain. She had minimal relief with medication and heat compress. Plaintiff reported being able to walk for 100 feet at a time, stand for ten minutes, sit for ten minutes, lift and carry up to eight pounds, climb up to three

steps of stairs, cook, feed, and bathe herself. She did not clean her house, drive, or shop. She had difficulty putting on her shoes and socks. On exam, Dr. Lopez noted lymphedema, +2, non-pitting of the left lower leg and ankle. She was tender in her left knee and had mild swelling. Plaintiff was able to get on and off the exam table with mild difficulty and walk greater than 50 feet without support. Her gait was mildly-antalgic without the use of an assistive device. She hopped on the left leg with mild difficulty. The range of motion of the knees was limited. The range of motion of the hips, ankles, and cervical spine was not limited. She had tenderness in the right lumbar area and the range of motion of the lumbar spine was limited. A straight leg raise test was negative bilaterally. Dr. Lopez assessed Plaintiff with lumbago, no radiculopathy; lumbar degenerative disc disease; arthralgia of the knees; probable degenerative joint disease of the knees; status post bilateral knee arthroscopic surgery; and chronic left leg lymphedema. (Tr. 300-05).

Images of Plaintiff's left knee from March 25, 2015 demonstrated no acute bony abnormality; mild medial compartment joint space narrowing; and an incidental note of sessile osteoachondroma arising from the upper peripheral medial femoral condyle. (Tr. 307). Images of Plaintiff's lumbar spine showed no acute osseous abnormality of the lumbar spine with possible mild facet joint arthropathy at L5-S1. (Tr. 309).

Plaintiff followed up with PA John Verna at Southern Illinois Healthcare on April 29, 2016. She complained of bilateral knee pain so PA Verna ordered an MRI

and referred her to an orthopedist. On exam, Plaintiff demonstrated arthralgias and joint pain in the right knee and swelling of the left lower extremity. (Tr. 349-52).

Plaintiff saw PA Verna on May 12, 2016. On exam, she had normal motor strength and tone. There was non-pitting edema to the knee in her left lower extremity. (Tr. 344-48).

Plaintiff followed up with PA Verna on May 19, 2016. On exam, her motor strength and tone were normal. She had non-pitting edema to the lower left knee. (Tr. 340-43).

Plaintiff saw PA Verna on June 27, 2016. She had no muscle aches or weakness on exam and her motor strength and tone were normal. She had edema in her extremities. (Tr. 337-39).

Plaintiff presented to Dr. Daniel Schwarze on August 4, 2016. Plaintiff complained of right knee pain that was aggravated by walking, lifting, bending, and squatting, and relieved by sitting. Associated symptoms included popping, clicking, buckling, and grinding. On exam, Dr. Schwarze noted no warmth or erythema of the right knee. Swelling and genu varum deformity were present. Plaintiff demonstrated tenderness of the medial femoral condyle, adductor tubercle, medial joint line, medial tibial plateau, and Gerdy's tubercle. There was no tenderness of the lateral patellar facet. Plaintiff also had tenderness of the medial patellar retinaculum, patellar tendon, medial collateral ligament, and pes anserinus. There was no tenderness of the saphenous nerve. Active range of motion was limited and

crepitus was present. Flexion was to 90 degrees an extension to five degrees. Passive range of motion was also limited. McMurray's, Apley's compression, and Steinman's displacement test were positive. There was no laxity and Lachman test was negative. Plaintiff's flexion and extension were 5/5. Dr. Schwarze assessed Plaintiff with bilateral knee pain, chondromalacia of patella in the right knee, and osteoarthritis of the right knee. He prescribed Plaintiff Naprosyn for chondromalacia and administered an injection into Plaintiff's right knee for osteoarthritis. He also referred Plaintiff to physical therapy for her osteoarthritis. (Tr. 396-400).

Plaintiff presented to Orthopedic & Sports Medicine O'Fallon on October 10, 2016 with bilateral knee pain. Plaintiff's pain worsened when she climbed stairs, was active, and was on her feet. She tried Tylenol and anti-inflammatories, along with an injection that did not help her at all. On exam, Plaintiff ambulated without too much difficulty. She was tender to palpation over the medial joint line. There was no pain with varus or valgus stress. She was 10 degrees short of full extension. She could only flex to about 70 degrees due to pain. Her quad strength was good and her extensor mechanism was intact. Plaintiff did not have any instability on ligamentous exam within the knee. There was no swelling or effusion. Three views of the right knee showed moderate arthritic change in the medial compartment and more mild changes in the other two compartments. Plaintiff was assessed with right knee osteoarthritis and obesity. The treatment provider opined that Plaintiff's

arthritis was not severe enough to consider surgery but that she may benefit from injections and therapy. (Tr. 392-94).

## Analysis

Plaintiff argues the ALJ's decision must be reversed and remanded because he did not consider the effects of Plaintiff's edema or lymphedema on her RFC.

While it is well established that an ALJ need not mention every piece of evidence in the record, an ALJ cannot ignore an entire line of evidence contrary to his ruling. *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). Likewise, an ALJ must minimally articulate his analysis so the Court can conduct an informed review. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).

Here, the record consistently notes findings of edema and lymphedema on exam and Plaintiff testified that these conditions forced her to elevate her left leg throughout the day. The ALJ, though, failed to even mention edema or lymphedema in his analysis. This was erroneous. "When an ALJ recommends that the agency deny benefits, it must first build an accurate and logical bridge from the evidence to the conclusion. In other words, as with any well-reasoned decision, the ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). ALJ Gulick did not satisfy this duty because he failed to offer any reason for rejecting Plaintiff's allegations related to her edema and lymphedema. And although the record may ultimately support that Plaintiff's edema and lymphedema are not disabling, the Court cannot reweigh the evidence

or substitute its own judgment for that of the ALJ's. *Blakley v. Amax Coal Co.*, 54 F.3d 1313, 1318 (7th Cir. 1995). Moreover, the ALJ's failure to address all of Plaintiff's conditions is not harmless error. An error is deemed harmless only when the Court can "predict with great confidence that the result on remand would be the same." *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). Here, Plaintiff testified she had to elevate her left leg throughout the day because of her edema and lymphedema. The ALJ did not include this limitation in any of the hypotheticals posed to the VE at the evidentiary hearing. Therefore, the Court cannot say whether this limitation, if accepted, would preclude employment. The Commissioner points out that Plaintiff's counsel did not ask the VE about the limitation, either, on cross-examination. However, the ALJ found Plaintiff could not perform any past relevant work. Thus, it was the ALJ's duty at Step 5, and not Plaintiff's, to establish Plaintiff could perform other jobs. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ's decision does not indicate he considered the effects of Plaintiff's edema and lymphedema on her RFC. Therefore, the decision must be reversed and remanded. Because this error warrants reversal, the Court will not address Plaintiff's remaining arguments.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner

for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATE:  November 13, 2018.**


                                                 **s/ Clifford J. Proud**
                                                 **CLIFFORD J. PROUD**
                                                 **UNITED STATES MAGISTRATE JUDGE**